UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

COMMONWEALTH OF
MASSACHUSETTS,

                Plaintiff,

    v.

THE LANE CONSTRUCTION
CORPORATION,

                Defendant.

Case No. 19-10578

**COMPLAINT**

## INTRODUCTION

1.      The Lane Construction Corporation ("Lane") owns and formerly operated a construction sand and gravel mining and asphalt manufacturing facility at 1 Willow Hill Road, Lee, Massachusetts (the "Facility"). Lane illegally placed gravel ("Industrial Material") on the banks of the Housatonic River adjacent to the Facility. The Industrial Material has spilled or eroded down from the river banks into the Housatonic River.

2.      Lane discharged Industrial Material to the river's banks and to the river by moving it around the Facility with heavy equipment and by stockpiling it in piles immediately above the river's banks. Pollutants from the Industrial Material travel to the river after being mobilized by rain or snow-melt.

3.      Sedimentary material that is discharged into waterways destroys habitat, harms aquatic organisms, and can contribute to flooding. The Housatonic River is a state-listed impaired waterbody and is habitat for several species that are endangered or of special concern. These

include mollusks such as the Creeper, the Triangle Floater, and the Boreal Marstonia and fish such as the Bridle Shriner and the Longnose Sucker. The survival of these aquatic organisms is threatened by excessive sedimentation. Sediment settles to the bottom of a river where it disrupts and smothers bottom feeding organisms such as mollusks. Excessive sedimentation harms the entire food chain by destroying habitat and killing the smaller organisms on which larger ones depend. Certain chemical pollutants, including toxic pollutants such as heavy metals, pesticides, and petroleum by-products, bind to sediment and are picked up by rainwater and snow-melt (jointly, "stormwater") as it washes across the land during events. Stormwater contaminated with these pollutants can significantly impact water quality when it is discharged to rivers and other waterbodies. Sediment can also alter the flow of water in a river and reduce the river's depth, contributing to flooding.

4.      Lane's discharges of pollution to the Housatonic River and its banks are not authorized by any permit and violate federal and state environmental laws.

5.      The Commonwealth of Massachusetts (the "Commonwealth") brings this civil suit to enforce the requirements of the federal Clean Water Act, 33 U.S.C. § 1251, *et seq.* (the "Clean Water Act" or "the Act"), the Massachusetts Wetlands Protection Act, G.L. c. 131, § 40, and the Massachusetts Clean Waters Act, G.L. c. 21, §§ 26-53. The Commonwealth seeks injunctive relief, civil penalties, and other relief the Court deems appropriate to redress Lane's illegal discharges of pollution to Housatonic River and its banks.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C.

§ 1331 (an action arising under the laws of the United States) and 28 U.S.C. § 1367 (supplemental jurisdiction over related state claims).

7.      On July 24, 2018, plaintiff provided notice of Lane's violations of the federal Clean Water Act, and of its intention to file suit against Lane (the "Notice Letter"), to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region 1; the Commissioner of the Massachusetts Department of Environmental Protection ("MassDEP"); and to Lane, as required by the Act, 33 U.S.C. § 1365(b)(1)(A).

8.      More than sixty days have passed since notice was served.

9.      This action is not barred by any prior state or federal action to enforce the violations alleged in this complaint.

10.     The Commonwealth has an interest in protecting for its residents the integrity of Massachusetts waters, and the related health, safety, economic, recreational, aesthetic and environmental interest those waters provide. The interests of the Commonwealth have been, are being, and will continue to be adversely affected by Lane's failure to comply with environmental laws, as alleged herein. The relief sought herein will redress the harms to the Commonwealth caused by Lane's activities. Continuing commission of the acts and omissions alleged herein will irreparably harm the Commonwealth, for which harm it has no plain, speedy, or adequate remedy at law.

11.     Venue is proper in the District Court of Massachusetts pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

**PARTIES**

12.     Plaintiff is the Commonwealth appearing by and through the Attorney General.

13.     The Attorney General is the chief law officer of the Commonwealth, with offices at One Ashburton Place, Boston, Massachusetts. She is authorized to bring this action and to seek the relief requested herein, under G.L. c. 12, §§ 3 and 11D.

14.     Defendant Lane is a Connecticut corporation that owns and formerly operated a construction sand and gravel mining and asphalt manufacturing facility in Lee, Massachusetts. The company is headquartered in Cheshire, Connecticut with additional offices and plants in the United States. The Lane Construction Corporation operates as a subsidiary of Lane Industries Incorporated, which is a wholly owned subsidiary of Salini Impregilo U.S. Holdings, Inc.

## STATUTORY BACKGROUND

### Federal Clean Water Act Requirements

15.     The Clean Water Act makes the discharge of pollution into waters of the United States unlawful unless the discharge is in compliance with certain statutory requirements, including the requirement that the discharge be permitted by the Federal Environmental Protection Agency ("EPA") under the National Pollutant Discharge Elimination System ("NPDES"). *See* Sections 301(a), 402(a) and 402(p) of the Act. 33 U.S.C. §§ 1311(a), 1342(a), 1342(p).

16.     Polluted stormwater is the leading cause of water quality impairment in Massachusetts. During every rain or snowmelt event, runoff flows over the land surface, picking up potential pollutants such as sediment, nutrients, metals and petroleum by-products. Polluted stormwater runoff can be harmful to plants, animals, and people. Excess sediment clouds the water and makes it difficult or impossible for aquatic plants to grow. Sediment also destroys aquatic habitats. Excess nutrients cause algae blooms that reduce dissolved oxygen in the water column, harming fish and other aquatic organisms. Bacteria and other pathogens can wash into swimming areas and create

health hazards. Toxic pollutants can poison aquatic life. Land animals and people can become sick from eating diseased fish or ingesting polluted water.

17.      In order to minimize polluted stormwater discharges from industrial facilities, EPA has issued a general industrial stormwater permit ("Stormwater Permit") under the NPDES program. EPA first issued the Stormwater Permit in 1995 and reissued the permit in 2000, 2008, and 2015. *See* 60 Fed. Reg. 50804 (Sept. 29, 1995); 65 Fed. Reg. 64746 (Oct. 30, 2000); 73 Fed. Reg. 56572 (Sept. 29, 2008); 80 Fed. Reg. 34403 (June 4, 2015).

18.      Mineral mining and dressing facilities and asphalt manufacturing facilities are subject to the requirements of this Stormwater Permit. Stormwater Permit, Appendix D, pgs. D-2 and D-3.

19.      The Stormwater Permit requires these facilities to, among other things:

a.      prepare a stormwater pollution prevention plan ("SWPPP") that, among other things, describes the facility and identifies all stormwater outfalls, Stormwater Permit, pg. 31;

b.      submit to EPA a "Notice of Intent" to be covered by the Stormwater Permit that lists all stormwater outfalls by a unique 3-digit code and corresponding latitude and longitude coordinates, Stormwater Permit, Appendix G;

c.      ensure that pollutant control measures minimize pollutants in stormwater discharges, Stormwater Permit, pg. 14;

d.      locate materials, equipment, and activities to contain potential spills, Stormwater Permit, pg. 15;

e.      minimize erosion by stabilizing exposed soils at the facility and use structural and non-structural control measures to minimize the discharge of sediment, Stormwater Permit, pg. 17;

f.      evaluate for and eliminate unauthorized non-stormwater discharges, Stormwater
        Permit, pg. 19;

g.      ensure that stormwater discharges do not cause or have the reasonable potential to
        cause or contribute to a violation of water quality standards, Stormwater Permit, pg.
        20;

h.      implement specific best management practices applicable to mineral mining and
        dressing facilities, Stormwater Permit, pgs. 101-113;

i.      monitor stormwater discharges from all outfalls for compliance with benchmarks
        applicable to mineral mining and dressing facilities and asphalt manufacturing
        facilities, Stormwater Permit, pgs. 39, 61 and 113;

j.      report all monitoring results for all facility outfalls to EPA by specified deadlines,
        Stormwater Permit, pgs. 48-49;

k.      conduct corrective action to expeditiously eliminate excessive stormwater pollution
        and unauthorized non-stormwater discharges, Stormwater Permit, pgs. 27-29;

l.      conduct routine facility inspections at least quarterly (Stormwater Permit, pg. 22)
        and quarterly visual assessments (Stormwater Permit, pg. 24) to, among other
        things, sample and assess the quality of the facility's stormwater discharges, ensure
        that stormwater control measures required by the permit are functioning correctly
        and are adequate to minimize pollutant discharge, and timely perform corrective
        actions when they are not, Stormwater Permit, pgs. 22-26;

m.      timely prepare and submit to EPA annual reports that include findings from the
        facility inspections and visual assessments and the documentation of corrective
        actions, Stormwater Permit, pgs. 49-50; and

6

n.       comply with any additional Massachusetts requirements, including but not limited

the requirements of the Massachusetts Clean Waters Act and the Massachusetts

Wetlands Protection Act and their implementing regulations. Stormwater Permit,

pg. 170.

20.     Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions

against any "person," including individuals, corporations, or partnerships, for violations of NPDES

permit requirements and for unpermitted discharges of pollutants. 33 U.S.C. §§ 1365(a)(1) and (f),

§ 1362(5).

21.     The Commonwealth is a "citizen" within the meaning of Section 505 of the Act, because it

is a "person" having an interest which is or may be adversely affected. *See* Section 505(g); 33

U.S.C.   § 1365(g).

22.     Under Section 505 of the Clean Water Act, this Court has authority to enjoin Lane's

violations of the Stormwater Permit, and to impose penalties of up to $52,414 per day for each of

the company's prior violations. *See* 33 U.S.C. §§ 1365(a); 1319(d); 40 C.F.R. §§ 19.1 - 19.4;82

Fed. Reg. 3633 (Jan. 12, 2017).

## State Environmental Requirements

*Wetlands Protection Act*

23.     The Wetlands Protection Act, G.L. c. 131, § 40, and its implementing regulations, 310

C.M.R. §§ 10.00 et seq. ("Wetlands Regulations"), establish a comprehensive regulatory scheme to

prevent damage to the Commonwealth's wetlands resource areas and to compel restoration of

wetland resources that are illegally altered or filled.

24.     The Wetlands Protection Act and the Wetlands Regulations limit activities in various

defined wetlands resource areas, including land under rivers, riverfront areas, and banks that border

rivers. G.L. c. 131 § 40. Land under rivers, riverfront areas, and river banks serve many important functions, including improving water quality, reducing flood damage, preventing pollution, and protecting fisheries and wildlife habitat. 310 C.M.R. §§ 10.54(1); 10.56(1); 10.58(1). The alteration of land under rivers can harm fish and other aquatic organisms by destroying habitat for the smaller aquatic plants and animals at the bottom of the food chain and by reducing the circulation of oxygen in the water column. The alteration of river banks and riverfront areas can harm water quality by reducing the filtering of sediments, toxic substances (such as heavy metals), and nutrients (such as phosphorus and nitrogen) from stormwater.

25.     Accordingly, anyone who plans to conduct activities that may compromise those resources must notify, and obtain authorization from, the local Conservation Commission or MassDEP before commencing the activities. G.L. c. 131, § 40; 310 C.M.R. §§ 10.02(2)(a); 10.05(4)(a). It is also a violation to leave in place unauthorized fill, or otherwise fail to restore illegally altered land to its original condition. G.L. c. 131, § 40; 310 C.M.R. §§ 10.54(4); 10.56(4); 10.58(4).

26.     Under G.L. c. 131, § 40, a court may enjoin violations of the Wetlands Protection Act and may enter such orders as it deems necessary to remedy the violations, including orders to restore the altered resource to its original condition.

27.     Pursuant to G.L. c. 131, § 40, any person who violates the Wetlands Protection Act or the Wetlands Regulations shall be subject to a civil penalty of up to $25,000 for each violation, with each day such violation occurs or continues constituting a separate violation.

28.     The Attorney General has authority to enforce the Wetlands Protection Act and its implementing regulations pursuant to state law. *See* G.L. c. 12, §§ 3 and 11D.

*Clean Waters Act*

29.     The Massachusetts Clean Waters Act, G.L. c. 21, §§ 26–53 is intended "to enhance the quality and value of water resources and to establish a program for prevention, control, and abatement of water pollution." G.L. c. 21, § 27.

30.     Pursuant to G.L. c. 21, § 27(12), Mass DEP has adopted rules and regulations to protect the quality and value of water resources in Massachusetts. These regulations are published at 314 C.M.R. §§ 2.00–18.00.

31.     The Clean Waters Act prohibits certain discharges of pollutants, including but not limited to industrial materials and industrial runoff, without a state issued discharge permit.  M.G.L. c. 21, § 43; 314 CMR §§ 3.03(1), 3.02. The Clean Waters Act also prohibits persons from engaging in activities that may reasonably result, directly or indirectly, in discharge of pollutants into waters of the Commonwealth without a state issued permit unless exempted by certain provisions not applicable here. M.G.L. c. 21, § 43(2); 314 C.M.R. § 3.04(1).

32.     G.L. c. 21, § 46 authorizes injunctions for violations of G.L. c. 21.

33.     Pursuant to G.L. c. 21, § 42, any person who violates the Massachusetts Clean Waters Act or its regulations shall be subject to a civil penalty of up to $50,000 for each violation, with each day such violation occurs or continues constituting a separate violation.

34.     The Attorney General has authority to enforce the Clean Waters Act and its implementing regulations pursuant to state law. *See* G.L. c. 12, §§ 3 and 11D.

## STATEMENT OF FACTS

### Description of the Lane Facility & Activities

35.     Industrial Material, including construction sand and gravel and hot-mix asphalt, is used, extracted, manufactured and sold at the Facility.

36.     The Lane Facility is comprised of hundreds of acres and an approximately 1/3-mile portion

of its western edge borders the Housatonic River (the "Housatonic River" or the "River"). *See*

Attachment A, an aerial image of the Facility depicting the approximately 1/3-mile portion of the

Facility's western edge that is immediately above the banks of the Housatonic River.

37.     MassDEP and EPA have included the Housatonic River, including the segment of the

River adjacent to the Lane Facility, on the list of impaired waterbodies pursuant to Section 303(d)

of the Clean Water Act. Section 303(d) requires states to submit to EPA a list of impaired waters

for which additional pollutant reduction regulatory measures are necessary. 33 U.S.C. § 1313(d).

Segment MA21-19, the segment of the river adjacent to Lane, is impaired by, among other things,

PCBs, phosphorus and objectionable algal growth.

38.     Lane's operations take place mostly outside.

39.     Industrial Material is moved around the Facility with heavy equipment, including in areas

immediately above the banks of the Housatonic River on the Facility's western edge.

40.     Lane has created piles of Industrial Material that are located at various locations at the

Facility, including in areas immediately above the banks of the Housatonic River on the Facility's

western edge.

41.     Lane's Industrial Material is sediment-laden.

## **Lane's Discharge of Pollutants from the Facility**

### *Sediment Discharges to the Banks of the Housatonic River*

42.     Lane's movement of Industrial Material around the Facility in the vicinity of the

Housatonic River has resulted in and continues to result in the discharge of Industrial Material to

the banks of the Housatonic River.

43.     Industrial Material from the piles immediately above the banks of the Housatonic River has spilled over and continues to spill over onto the banks of the River.

44.     Industrial Material from the Facility is present on the banks of the Housatonic River at various locations, including but not limited to the vicinity of the Industrial Material piles. *See* Attachment B, a photograph illustrating the presence of Industrial Material on the banks of the Housatonic River on the Facility's western edge.

*Sediment Discharges to the Housatonic River*

45.     Lane's movement of Industrial Material around the Facility in the vicinity of the Housatonic River has resulted in and continues to result in the discharge of Industrial Material to the Housatonic River.

46.     Industrial Material from the piles immediately above the banks of the Housatonic River has spilled over and continues to spill over from these piles into the River.

*Sediment Discharges to the Land Under the Housatonic River*

47.     Industrial Material from the Facility that has discharged to the River's banks and the River has settled to the land under the Housatonic River adjacent to and downstream of the Industrial Material piles.

48.     Industrial Material from the Facility is present on the land under the Housatonic River adjacent to and downstream of the Industrial Material piles.

*Polluted Stormwater Discharges to the Housatonic River*

49.     Stormwater that comes into contact with the Facility becomes contaminated with pollutants.

50.     Stormwater runs down the banks of the Housatonic River through cracks or fissures in berms placed immediately above the banks of the Housatonic River, and forms channels and gulleys that serve as conduits for polluted stormwater to flow to the Housatonic River.

51.     Stormwater runs from the Industrial Material piles immediately above the banks of the Housatonic River into the River at various locations on the western side of the Facility.

*Lane's Inadequate Implementation of EPA's Stormwater Requirements*

52.     On or around October 8, 2015, Lane submitted a Notice of Intent to be covered by the Stormwater Permit.

53.     Lane's Notice of Intent to be covered by the Stormwater Permit identified only one outfall at the Facility, "Outfall 001," located at GPS coordinates +42.334512; -73.243555. *See* Attachment C, an annotated aerial photograph showing the location of Outfall 001.

54.     In addition to Outfall 001, there are other locations at the Facility where Lane discharges stormwater. These locations include, but are not limited to, areas where there are cracks or fissures in the berm placed by Lane above the banks of the Housatonic River, and from areas where Industrial Material piles are situated immediately above the banks of the Housatonic River, such as the area depicted on Attachment B.

55.     Lane has failed to identify all locations from which polluted stormwater and unauthorized non-stormwater pollution may be discharged from the Facility, and consequently has failed to adequately monitor, report on, and control pollutant discharges from these locations.

56.     Specifically, Lane has failed to:

    a.  ensure that its pollutant control measures minimize pollutants in its stormwater
        discharges;

b. ensure that pollutant discharges do not cause or contribute to a violation of water quality standards, and comply with EPA's benchmark limits;

c. report to EPA monitoring results for all of its outfalls;

d. take corrective action to eliminate non-stormwater discharges of Industrial Material and excessive pollutants in stormwater discharges;

e. appropriately conduct routine and quarterly facility inspections to ensure, among other things, that control measures are functioning correctly and are adequate to minimize pollutant discharges; and

f. comply with additional state requirements incorporated by reference into the Stormwater Permit, including the Massachusetts Clean Waters Act and the Massachusetts Wetlands Protection Act (*see* Causes of Action III and IV, below).

*Lane's Failure to Seek Authorization from the Commonwealth for*

*its Industrial Material Discharges*

57. Lane has never sought or received authorization from MassDEP under the Wetlands Protection Act to discharge Industrial Material to the banks of the Housatonic River or to land under the Housatonic River.

58. Lane has never sought or received authorization from MassDEP under the Clean Waters Act to discharge Industrial Material from its Industrial Material piles or from heavy equipment into the Housatonic River.

**FIRST CAUSE OF ACTION**
**Unpermitted Discharges of Industrial Material into the Housatonic River:**
**Violations of Section 301(a) of the Federal Clean Water Act; 33 U.S.C. § 1311(a)**

59. The Commonwealth realleges and incorporates by reference the allegations contained in the above paragraphs.

13

60.     Lane's material piles are "point sources" within the meaning of Section 502(14) of the Act. 33 U.S.C. § 1362(14).

61.     The heavy machinery that Lane uses to move material around the Facility are "point sources" within the meaning of Section 502(14) of the Act. 33 U.S.C. § 1362(14).

62.     The channels and fissures in the Industrial Material piles and the River's banks created by runoff from the Lane Facility are "point sources" within the meaning of Section 502(14) of the Clean Water Act. 33 U.S.C. § 1362(14).

63.     Industrial Material is a "pollutant" within the meaning of Section 502(6) of the Clean Water Act, 33 U.S.C. § 1362(6).

64.     Lane is a "person" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

65.     The Housatonic River is a "navigable water," within the meaning of Section 502(7) of the Clean Water Act, 33 U.S.C. § 1362(7).

66.     By discharging Industrial Material to the Housatonic River from the Facility without a NPDES permit, Lane has violated and continues to violate the Clean Water Act's prohibition on discharges from point sources without a NPDES permit. *See* Sections 301(a), 402(a) and 402(p) of the Clean Water Act, 33 U.S.C. §§ 1311(a), 1342(a), 1342(p).

67.     These violations establish an ongoing pattern of failure to comply with the Clean Water Act's prohibition against unpermitted discharges.

68.     Each of Lane's violations of the prohibition against unpermitted discharges is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a), for each day on which the unpermitted discharge occurred and/or continued.

## SECOND CAUSE OF ACTION
### Noncompliance with the Federal Stormwater Permit:
### Violations of Section 301(a) of the Federal Clean Water Act; 33 U.S.C. § 1311(a)

69.     The Commonwealth realleges and incorporates by reference the allegations contained in the above paragraphs.

70.     By failing to include the location of all of its stormwater discharges in its Notice of Intent, Lane has violated section 1.2.1 of the Stormwater Permit. (*See also* Stormwater Permit, Appendix G).

71.     By failing to ensure that pollutant control measures minimize pollutants in its stormwater discharges, Lane has violated Section 2.1 of the Stormwater Permit.

72.     By failing to evaluate for the presence of and eliminate all unauthorized non-stormwater discharges at the Facility, Lane has violated Section 2.1.2.9 of the Stormwater Permit.

73.     By failing to ensure that its stormwater discharges do not cause or contribute to a violation of water quality standards, Lane has violated Section 2.2.1 of the Stormwater Permit.

74.     By failing to monitor its stormwater discharges from all of its outfalls for compliance with EPA's benchmark limits, Lane has violated Section 6.1.1 of the Stormwater Permit.

75.     By failing to report to EPA monitoring results for all of its outfalls, Lane has violated Section 7.4 of the Stormwater Permit.

76.     By failing to take corrective action and eliminate non-stormwater discharges and excessive sedimentation, Lane has violated Section 4.1 of the Stormwater Permit.

77.     By failing to appropriately conduct facility inspections, Lane has violated Sections 3.1 and 3.2 of the Stormwater Permit.

78.     By failing to comply with additional state requirements, including but not limited to the

Massachusetts Wetlands Protection Act and the Massachusetts Clean Waters Act, Lane has

violated Section 9.1.2.1 of the Stormwater Permit.

79.     These violations establish an ongoing pattern of failure to comply with the Stormwater

Permit's requirements.

80.     Each of Lane's violations of the requirements of the Stormwater Permit is a separate and

distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a), for each day on which the

violation occurred and/or continued.  *See also* Section 505 (a)(1) and (f); 33 U.S.C. §§ 1365 (a)(1)

and (f).

### THIRD CAUSE OF ACTION
**Violations of the Massachusetts Wetlands Protection Act and the Wetlands Regulations:
G.L. c. 131, § 40; 310 C.M.R. § 10.00**

81.     The Commonwealth realleges and incorporates by reference the allegations contained in

the above paragraphs.

82.     The Wetlands Protection Act and its implementing regulations provide, with exceptions not

relevant here, that no person shall remove, fill, dredge, or alter areas subject to that Act's

protection, or cause, suffer, or allow such activity, without first filing a Notice of Intent with the

appropriate local Conservation Commission and obtaining an Order of Conditions from the

Conservation Commission or a Superseding or Final Order of Conditions from the Department

permitting the activity.  *See* G.L. c. 131, § 40; 310 C.M.R. §§ 10.02(2)(a), 10.05(4)(a).

83.     Areas subject to the protection of the Wetlands Protection Act and its regulations include

river banks and land under rivers. *See* G.L. c. 131, § 40; 310 C.M.R. § 10.02(1).

84.     The Wetlands Protection Act defines "person" to "include any individual, group of individuals, . . . partnership, . . . company, . . . or any other legal entity or its legal representative, agents or assigns."  G.L. c. 131, § 40.

85.     Pursuant to 310 C.M.R. § 10.04, "fill" means "to deposit any material so as to raise an elevation, either temporarily or permanently."

86.     Pursuant to 310 C.M.R. § 10.04, "alter" means "to change the condition of" any area subject to the protection of the Wetlands Protection Act, including, without limitation, "the changing of pre-existing drainage characteristics, . . . sedimentation patterns, flow patterns and flood retention areas," and "the destruction of vegetation."

87.     Lane is a "person" within the meaning of G.L. c. 131, § 40, and 310 C.M.R. §§ 10.00 et seq.

88.     The area beneath the Facility's western edge and above the mean annual low flow level of the Housatonic River in the location depicted by a red line on Attachment A is river "bank" as defined in the 310 C.M.R. § 10.54(2).

89.     The land under the Housatonic River adjacent to and downstream of the Facility is "Land under Water Bodies and Waterways" as defined in the Wetlands Regulations. 310 C.M.R. §§ 10.04,  10.56(2).

90.     By discharging Industrial Materials onto the banks of the Housatonic River, Lane has altered or filled an area subject to the protection of the Wetlands Protection Act and its regulations.

91.     By discharging Industrial Materials to land under the Housatonic River, Lane has altered or filled an area subject to the protection of the Wetlands Protection Act and its regulations.

92.     Lane's alteration or filling of banks of the Housatonic River and land under the Housatonic River was not authorized by any Order of Conditions or Superseding Order of Conditions.

17

93.     By altering or filling banks of the Housatonic River and land under the Housatonic River without an Order of Conditions from the Lee Conservation Commission or Superseding Order of Conditions from Mass DEP, Lane has violated the Wetlands Protection Act and the WetlandRegulations. G.L. c. 131, § 40; 310 C.M.R. §§ 10.02(2)(a),10.05(4)(a).

94.     By allowing the unauthorized fill to remain in place on the River's banks and land under the River, Lane violated and continues to violate G.L. c. 131, § 40 and 310 C.M.R. § 10.02(a).

95.     Each of Lane's violations of the Wetlands Protection Act and its implementing regulations is a separate and distinct violation for each day on which the violation occurred and/or continued.

### FOURTH CAUSE OF ACTION
### Violations of the Massachusetts Clean Waters Act:
### G.L. c. 21, § 43(2); 314 C.M.R. § 3.00

96.      The Commonwealth realleges and incorporates by reference the allegations contained in the above paragraphs.

97.     The Massachusetts Clean Waters Act and its implementing regulations provide, with exceptions not relevant here, that no person shall discharge pollutants into waters of the Commonwealth without a state issued pollutant discharge permit. *See* G.L. c. 21, § 43(2); 314 C.M.R. § 3.03.

98.     G.L. c. 21, § 26 and the regulations at 314 C.M.R. § 3.02 define "person" to mean, *inter alia*, any "public or private corporation or authority, individual, partnership or association, or other entity."

99.     The regulations at 314 C.M.R. § 3.02 define "discharge" as "any addition of any pollutant or combination of pollutants to waters of the Commonwealth from any source …."

100.    The regulations at 314 C.M.R. § 3.02 define "pollutant" as "any element or property of … industrial … waste, runoff … or other matter, in whatever form and whether originating at a point

source or major non-point source, which is or may be discharged, drained or otherwise introduced into … waters of the Commonwealth."

101.    The regulations at 314 C.M.R. § 3.02 define "Waters of the Commonwealth" as "all waters within the jurisdiction of the Commonwealth including, without limitation, rivers, streams, lakes, ponds . . . wetlands, coastal waters, and ground waters."

102.    Lane is a "person" within the meaning of G.L. c. 21, § 26 and 314 C.M.R. § 3.02.

103.    Lane's Industrial Material is a "pollutant" within the meaning of 314 C.M.R. § 3.02.

104.    The Housatonic River is a "Water[s] of the Commonwealth" within the meaning of 314 .M.R. § 3.02.

105.    By discharging Industrial Materials into the Housatonic River, Lane violated G.L. c. 26, § 43(2) and 314 C.M.R. § 3.03(1).

106.    By storing Industrial Materials immediately above the banks of the Housatonic River in piles from which material is capable of spilling off towards the River, Lane has engaged in an activity that may reasonably result, directly or indirectly, in the discharge of pollutants to waters of the Commonwealth without a permit in violation of G.L. c. 21, § 43(2) and 314 C.M.R. § 3.04(1).

107.    Lane is not exempt by 314 C.M.R. § 3.05 for any of these violations.

108.    Each of Lane's violations of the Clean Waters Act and its implementing regulations is a separate and distinct violation for each day on which the violation occurred and/or continued.

## RELIEF REQUESTED

Wherefore, the Commonwealth respectfully requests that this Court grant the following relief:

1.    Enjoin Lane from storing Industrial Material immediately above the banks of the Housatonic River;

2.      Enjoin Lane from discharging Industrial Material into the Housatonic River without the necessary state and federal permits;

3.      Require Lane to implement the requirements of EPA's federal Stormwater Permit;

4.      Order Lane to pay civil penalties of up to:

        a.   $52,414 per day of violation of the Federal Clean Water Act, pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 82 Fed. Reg. 3633 (Jan. 12, 2017).

        b.   $25,000 for each day of each violation of the Wetlands Protection Act, G.L. c. 131, § 40, to the Commonwealth; and

        c.   $50,000 for each day of each violation of the Clean Waters Act, G.L. c. 21, §§ 26-53, to the Commonwealth.

5.      Order Lane to take appropriate actions to restore the quality of protected resource areas and waterways impaired by its activities;

6.      Award the Commonwealth's costs (including reasonable investigative, attorney, witness, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and

7.      Award any such other and further relief as this Court may deem appropriate.

Dated:  March 26, 2019

Respectfully submitted,

COMMONWEALTH OF MASSACHUSETTS

By its attorneys,

MAURA HEALEY
ATTORNEY GENERAL

*Nora J. Chorover /s/*
_____
Nora J. Chorover (Bar No. 547352)
Special Assistant Attorney General
Environmental Protection Division
Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, Massachusetts 02108
Tel: (617) 727-2200, ext. 2642
Nora.Chorover@mass.gov